**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Retail Ventures, Inc., *et al.*,

        Plaintiffs,                      Case No. 2:06cv443

v.                                   Judge Michael H. Watson

National Union Fire Insurance Company
of Pittsburgh, PA,

        Defendant.

## OPINION AND ORDER

Before the Court are the following:

1.    The September 5, 2007 Motion of Plaintiffs Retail Ventures, Inc., DSW Inc. and DSW Shoe Warehouse, Inc. (hereinafter collectively "Plaintiffs") for Partial Summary Judgment (Docs. 86 and 87). Defendant National Union Fire Insurance Company of Pittsburgh, PA. (hereinafter "Defendant") filed a Memorandum in Opposition on September 25, 2007 (Doc. 106). Plaintiffs filed a Reply Memorandum on October 16, 2007 (Doc. 119).

2.    The September 6, 2007 Motion of Defendant for Summary Judgment (Docs. 89 and 90). Plaintiffs filed a Memorandum in Opposition on September 27, 2007 (Doc. 109). Defendant filed a Reply Memorandum on October 12, 2007 (Doc. 116). Plaintiffs filed a Sur-reply Memorandum on April 2, 2008 (Doc. 161).

These motions are now ripe for review.  For the reasons set forth herein

Plaintiffs' Motion for Partial Summary Judgment is hereby **GRANTED** and Defendant's

Motion for Summary Judgment is hereby **DENIED**.

## I.  FACTS

### A.  Commercial Crime Policy

Plaintiffs purchased a blanket commercial crime policy from Defendant

(hereinafter "Crime Policy").  Plaintiffs renewed coverage with Defendant for the 2004-

2005 policy period.  Relevant portions of the Crime Policy follow.

> The Company in consideration of the payment of the premiums and subject
> to the Declarations made a part hereof, the General Agreements, Conditions
> and Limitations and other terms of this Policy, agrees with the Insured to pay
> the Insured for:

### INSURING AGREEMENTS

### EMPLOYEE DISHONESTY COVERAGE

I.  Loss of Money, Securities and other property which the Insured
shall sustain resulting directly from one or more fraudulent or
dishonest acts committed by an Employee, acting alone or in
collusion with others.

Dishonest or fraudulent acts as used in this Insuring Agreement
shall mean only dishonest or fraudulent acts committed by
such Employee with the manifest intent:

(a) to cause the Insured to sustain such loss; and

(b) to obtain financial benefit for the Employee, or for
any other person or organization intended by the
Employee to receive such benefit other than salaries,
commissions, fees, bonuses, promotions, awards,
profit sharing, pensions or other employee benefits
earned in the normal course of employment.[1]

---

[1]This portion of the Crime Policy shall be referred to hereinafter as "Section I".

## LOSS INSIDE THE PREMISES COVERAGE[2]

\* \* \*

Damage to the Premises by such Safe Burglary, Robbery or felonious abstraction, or by or following burglarious entry into the Premises or attempt thereat, provided with respect to damage to the Premises the Insured is the owner thereof or is liable for such damages.

\* \* \*

## EXCLUSIONS[3]

Section 2.  This policy does not apply:

\* \* \*

(k)     to the defense of any legal proceeding brought against the Insured, or to fees, costs or expenses incurred or paid by the Insured in prosecuting or defending any legal proceeding whether or not such proceeding results or would result in a loss to the Insured covered by this Policy, except as may be specifically stated to the contrary in this Policy;

\* \* \*

(m)     to damages of any type for which the Insured is legally liable, except direct compensatory damages arising from a loss covered under this Policy;

(n)     to costs, fees and other expenses incurred by the Insured in establishing the existence of or amount of loss covered under this Policy.

\* \* \*

---

[2]This portion of the Crime Policy shall be referred to hereinafter as "Premises Section".

[3]The exclusions set forth in Section 2 of the Crime Policy shall be referred to hereinafter collectively as "Section 2 Exclusions" and individually as "Section 2 Exclusion (x)".

## OWNERSHIP OF PROPERTY: INTERESTS COVERED

Section 5.  The Insured property may be owned by the Insured, or held by the Insured in any capacity whether or not the Insured is liable for the loss thereof, or may be property as respects which the Insured is legally liable provided, Insuring Agreements II, III and IV apply only to the interest of the Insured in such property, including the Insured's liability to others . . . .[4]

## ENDORSEMENT #17[5]

## COMPUTER & FUNDS TRANSFER FRAUD ENDORSEMENT

It is agreed that:

\* \* \*

2.      The policy is amended by adding the following Insuring Agreement:

## COMPUTER & FUNDS TRANSFER FRAUD COVERAGE

XVIII.  Loss which the Insured shall sustain resulting directly from:

A.      The theft of any insured property by Computer Fraud . . . .

3.      Section 3.  Definitions, is amended by adding the following:

Computer Fraud means the wrongful conversion of assets under the direct or indirect control of a Computer System by means of:

(1)      The fraudulent accessing of such Computer System;

\* \* \*

5.      All the exclusions in Section 2 of this policy which apply to Insuring Agreement II - except Exclusion (e) - shall also apply to Insuring Agreement XVIII . . . .

\* \* \*

---

[4]This portion of the Crime Policy shall be referred to hereinafter as "Section 5"

[5]This portion of the Crime Policy shall be referred to hereinafter as "Endorsement 17".

9.     Coverage does not apply to any loss of proprietary information, Trade Secrets, Confidential Processing Methods or other confidential information of any kind.[6]

* * *

## B.     Computer Hacking Incident

Between February 1, 2005 and February 14, 2005, an unknown hacker[7] fraudulently accessed Plaintiffs' computer systems wirelessly through a DSW store. Due to the fraudulent access, the hacker stole computer data for approximately 1.4 million customers, including, *inter alia*, credit card and checking account information (hereinafter collectively "Customer Information"). Plaintiffs learned of the hacking incident on March 5, 2005.

## C.     Plaintiffs' Claim Under The Policy

On March 18, 2005, Plaintiffs made a claim under the Crime Policy providing Defendant with notice of loss. Defendant acknowledged and reserved its rights by letter on April 15, 2005.

On September 16, 2005, Plaintiffs submitted its partial Proof of Loss to Defendant. Defendant, by letter dated January 30, 2006, notified Plaintiffs that coverage appeared to be precluded because, *inter alia*, Plaintiffs' loss fell within the Exclusion and did not result directly from the computer theft as to fall within Endorsement 17. Defendant invited additional information from Plaintiffs, while again reserving its rights.

---

[6]Section 9 of Endorsement 17 shall be referred to hereinafter as the "Exclusion". Moreover, for ease of reading, when referencing "proprietary information, Trade Secrets, Confidential Processing Methods or other confidential information of any kind", the Court shall refer solely to "proprietary information" unless it is necessary to state the complete language.

[7]While it is unknown how many hackers were involved in this incident, for ease of reading, the Court shall refer to one hacker.

Plaintiffs filed a second partial Proof of Loss on May 8, 2006. Defendant, by letter

dated May 12, 2006, notified Plaintiffs of its continued position that coverage was

precluded by, *inter alia*, the Exclusion, and acknowledged that all rights were mutually

reserved.

On June 29, 2007, Plaintiffs submitted their third, and most recent, Proof of Loss,

which set forth preliminary costs of $6,294,939.68.

## E.    Federal Trade Commission

The Federal Trade Commission (hereinafter "FTC") investigated the theft of

Plaintiffs' Customer Information. Plaintiffs and the FTC entered into a Consent Order on

December 1, 2005.

## D.    Customer Class Action Lawsuits

Four class action lawsuits were filed against Plaintiffs by Plaintiffs' customers for

the theft of their information:

- *Teresa Hendricks, individually and on behalf of a class v. DSW Shoe Warehouse, Inc.*, Case No. 1:05cv00767, United States District Court for the Western District of Michigan, filed on November 15, 2005, amended complaint filed on July 5, 2005, and settled August 2006;

- *Barbara Richardson, individually and on behalf of a class v. DSW, Inc.*, Case No.1:05cv04599, United States District Court for the Northern District of Illinois, filed on July 5, 2005, amended complaint filed on December 13, 2005, and settled August 2006;

- *Tracy L. Key, individually and on behalf of all others similarly situated v. DSW, Inc.*, Case No. 2:06cv00459, United States District Court for the Southern District of Ohio, filed on May 5, 2006, and settled May 2007; and

- *Deborah Levine and Debbie Rabinowitz, on behalf of themselves and all others similarly situated v. DSW, Inc.*, Case No. CV 06 586371, Court of Common Pleas for Cuyahoga County, Ohio, filed on March 10, 2006, which was pending at the time the parties filed their Motions for Summary Judgment.

### E.    Current Action

On May 9, 2006, Plaintiffs filed the instant action in the Franklin County, Ohio,

Court of Common Pleas.  Plaintiffs set forth claims for breach of contract, declaratory

judgment and breach of the obligation of good faith and fair dealing.  The matter was

removed to this Court on June 8, 2006 on the basis of diversity jurisidiction.

## II.    ANALYSIS

### A.    Fed. R. Civ. P. 56(c)

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c),

which provides:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file, together with
> the affidavits, if any, show that there is no genuine issue as to any material
> fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Summary judgment is

appropriate, however, if the opposing party fails to make a showing sufficient to establish

the existence of an element essential to that party's case and on which that party will bear

the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable

inferences in favor of the nonmoving party, and must refrain from making credibility

determinations or weighing the evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.,*

530 U.S. 133, 150-51 (2000).  The Court disregards all evidence favorable to the moving

party that the jury would not be required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.,* quoting *Liberty Lobby,* 477 U.S. at 257. The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.,* quoting *Matsushita,* 475 U.S. at 586.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris,* 260 F.3d 654, 665 (6th Cir. 2001).

### B.    Ohio Law

As this is a diversity of citizenship case, the substantive law of Ohio applies to the contract interpretation issues in question. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

In interpreting an insurance contract, the court is to give effect to the intent of the parties to the agreement. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St. 3d 270, 273 (1999), citing *Employers' Liab. Assur. Corp. v. Roehm*, 99 Ohio St. 343 (1919)

(syllabus). Ohio courts shall give insurance contract terms their plain and ordinary meaning unless another meaning is clearly apparent from the contents of the policy. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241 (1978) (syllabus ¶ 2). Further, a court must give meaning to every paragraph, clause, phrase, and word. *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir.1994). When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. *Id.* As a matter of law, a contract is unambiguous if it can be given a definite legal meaning. *Westfield Ins. Co. v. Galatis,* 100 Ohio St. 3d 216, 219 (2003), citing *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000).

A term is ambiguous if it is reasonably susceptible of more than one meaning. *St. Mary's Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 992 (6th Cir. 2003) (citations omitted). Where the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the nondrafting party. *Cent. Realty Co. v. Clutter*, 62 Ohio St. 2d 411, 413 (1980). In the insurance context, as the insurer customarily drafts the contract, an ambiguity in an insurance contract is ordinarily interpreted against the insurer and in favor of the insured. *King v. Nationwide Ins. Co.*, 35 Ohio St. 3d 208 (1988) (syllabus). Nonetheless, this rule "will not be applied so as to provide an unreasonable interpretation of the words of the policy." *Morfoot v. Stake*, 174 Ohio St. 506 (1963) (syllabus ¶ 1).

## C. Fidelity Bonds

A fidelity bond is "a contract whereby one for consideration agrees to indemnify the insured against loss arising from the want of integrity, fidelity, or honesty of employees or other persons holding positions of trust." *Fireman's Fund Ins. Co., v. Special Olympics Inter'l Inc.,* 249 F. Supp. 2d 19, 26 (D. Mass. 2003) (citations omitted); *Frontline Processing Corp. v. American Econ. Ins. Col.,* 149 P.3d 906, 909 (Mont. 2006) (A fidelity bond, or an employee dishonesty policy, "is a form of insurance in which the insurer agrees 'to indemnify an employer against a loss arising from the lack of integrity or honesty of an employee. . . ."); *RBC Mortgage Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 812 N.E.2d 728, 733 (Ill. 2004) (A fidelity bond "is a form of insurance in which the insurer undertakes to guaranty the fidelity of an officer, agent, or employee of the insured, or to indemnify the latter for losses caused by dishonesty or a want of fidelity on the part of such a person.").

Defendant consistently maintains that the Crime Policy is a fidelity bond. Notwithstanding Defendant's position, an examination of the Crime Policy, relative to the definitions above, reveals it is not a fidelity bond, *in toto,* as it provides more than fidelity coverage. Section I is the fidelity portion of the Crime Policy, providing coverage for loss resulting directly from the fraudulent or dishonest acts of Plaintiffs' employees. Section 1, however, is just one of many of the insuring agreements in the Crime Policy, most of which are not limited to losses resulting from the fraudulent or dishonest acts of Plaintiffs' employees. For example, the Premises Section provides coverage for damage to the inside of the premises resulting from, *inter alia*, burglary or robbery, with no requirement the act be perpetrated by an employee. Moreover, with respect to Endorsement 17, there

is no mention of providing coverage for loss resulting from the fraudulent or dishonest acts of Plaintiffs' employees. In fact, no party argues that the computer hacking was done by an employee, or by someone else working in concert with an employee.

Another aspect of the Crime Policy which results in the conclusion it is not solely a fidelity bond is the sections which provide coverage for liability to third parties. For example, the Premises Section and Section 5 both contain language which provides coverage to Plaintiffs for liability to third parties. Moreover, Section 2 Exclusion (m) discusses third-party damages.

Accordingly, the Crime Policy cannot be labeled solely a fidelity bond and the aspect of it which is, Section I, is not at issue currently. Moreover, the cases upon which Defendant relies are not persuasive. These cases involve fidelity bonds, or the sections of an insurance policy which contain the fidelity bond provision. As such, the interpretation of the language "loss resulting directly from", *RBC Mortgage Co.*, 812 N.E.2d at 730, or similar language, to deny coverage for third-party claims is in the context of the purpose of a fidelity bond. *Id.; Aetna Casualty & Surety Co. v. Kidder, Peabody & Co., Inc.*, 246 A.D.2d 202 (New York 1998). As the *RBC* court reasoned:

> If an employee's dishonesty causes losses to a third party, which then leads to litigation concluding in a judgment or settlement, the insured has not incurred a "direct loss" under a fidelity bond; the insured's loss is "indirect" and the third party's loss is "direct." To find coverage in these circumstances would convert a direct loss policy into a third party indemnity policy or liability policy, under which the liability insurer indemnifies its insured for the insured's "indirect" loss, but payment, in practical effect, runs directly to the third-party claimant. In the absence of a third-party-claims clause, an insured's fidelity bond, unlike a liability policy, does not provide indemnity for vicarious liability for losses suffered by others arising from its employee's tortious conduct.

*Id.* at 733.

2:06cv443

11

In contrast, the Crime Policy contains language indicating coverage for third party claims. More importantly, Endorsement 17 contains no language which renders it a fidelity bond. As such, in interpreting the language in Endorsement 17, the policy ramifications associated with a fidelity bond are not at issue.

**D.    Direct Loss**

The language at issue in Endorsement 17 is "[l]oss which the insured shall sustain resulting directly from . . . ." Numerous jurisdictions construed similar language in insurance policies. *E.g. Scirex Corp. v. Fed. Ins. Co.*, 313 F.3d 841, 849-850 (3d Cir. 2002); *Fed. Deposit Ins. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 205 F.3d 66 (2d Cir. 2000); *Resolution Trust Corp. v. Fid. & Deposit Co. of Md.*, 205 F.3d 615 (3d Cir. 2000); *Jefferson Bank v. Progressive Cas. Ins. Co.*, 965 F.2d 1274 (3d Cir. 1992); *First Nat'l Bank of Louisville v. Lustig*, 961 F.2d 1162 (5th Cir. 1992); *Rothschild Inv. Corp. v. Travelers Cas. & Sur. Co. of Am.*, 05 C 3041, 2006 U.S. Dist. LEXIS 30033, *25-26 (N.D. Ill. May 4, 2006); *Frontline*, 149 P.3d at 911; *Auto Lenders Acceptance Corp.v. Gentilini Ford, Inc.*, 854 A.2d 378 (N.J. 2004). "To determine whether a loss is a direct loss, the majority of federal courts apply a conventional proximate-cause test." *Rothschild Inv. Corp.*, 2006 U.S. Dist. LEXIS 30033 at *30, *citing Auto Lenders*, 854 A.2d at 386-87. They hold "the term 'direct loss' or its equivalent does, in fact, call for the application of a proximate-causation standard." *Id.* As such, "the 'direct cause of a loss' does not have to be the 'sole cause' or 'immediate cause,' but need only be a proximate or substantial cause . . . ." *Scirex,* 313 F.3d at 850.

As stated previously, this matter is before the Court based upon diversity, and the substantive law of Ohio applies. Currently, there is no Ohio case which interprets the

language, or similar language, of Endorsement 17. As such, it is the duty of this Court to determine how the Ohio Supreme Court would resolve the issue. Again, Endorsement 17 is not a fidelity bond as there is no mention of employee dishonesty. Moreover, the terms of Endorsement 17 indicate coverage for losses to third-party assets. Specifically, Section 2.XVIII.A. of Endorsement 17 states, "The theft of any *insured property* by Computer Fraud . . . ." When read in conjunction with Section 5, the language indicates coverage under the Crime Policy not only for the loss of Plaintiffs' own property but also for the loss of a third party's . Accordingly, the Court concludes the Ohio Supreme Court would analyze Endorsement 17 in the same manner as those cases set forth above, because to do otherwise would alter a liability contract into a fidelity bond and ignore the intent of the parties to the Crime Policy. *See Galatis,* 100 Ohio St. 3d at 219-20.

As such, applying a traditional proximate cause test, the Court concludes there is a sufficient link between the computer hacker's infiltration of Plaintiffs' computer system and Plaintiffs' financial loss to require coverage under Endorsement 17.

## E.    Exclusion

Next the Court must determine whether the Exclusion unambiguously bars coverage for the losses Plaintiffs sustained. When an insurance policy includes ambiguous exclusions, "'a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof.'" *Moorman v. Prudential Ins. Co. of Am.*, 4 Ohio St. 3d 20, 22 (1983), quoting *Home Indem. Co. v. Plymouth*, 146 Ohio St. 96 (1945). As such, for an exclusion provision to be given effect, Ohio law requires its language be "specific, clear, and exact."    *Owens Corning v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* No. 97-3367, 1998 U.S. LEXIS 26233, *9 (6th

Cir. Oct. 13, 1998) (citations omitted); *Lane v. Grange Mut. Cos.*, 45 Ohio St. 3d 63, 65

(Ohio 1989) ("The insurer, being the one who selects the language in the contract, must

be specific in its use; an exclusion from liability must be clear and exact in order to be

given effect."). Moreover, while allowing broad coverage provisions to stand, Ohio courts

"have not allowed broad exclusions to bar indemnification for claims otherwise covered."

*Owens*, 1998 U.S. LEXIS 26233 at *9-10 (citations omitted).

For these reasons, when there is ambiguity, the burden of proving the applicability

of an exclusion in its policy is bourne by the insurer, not the insured. *Cont'l Ins. Co. v.*

*Louis Marx Co.*, 64 Ohio St. 2d 399, 401 (1980). Courts should not, however, construe an

insurance contract against the insurer in the absence of ambiguity in its language.

*Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St. 3d 163 (1984)

Turning to the case at bar, there are many meanings which can be attributed to

"loss". WEBSTER'S INTERNATIONAL DICTIONARY (3rd 2002) (hereinafter "WEBSTER'S"), sets

forth the following, pertinent, definitions for "loss":

> **1** **a:** the act . . . of losing possession : failure to keep possession:
> DEPRIVATION . . . .
>
> **b:** the harm or privation resulting from losing or being separated from
> something or someone . . . .
>
> **c:** an instance of losing . . . .

* * *

**5** **a:** the state or fact of being destroyed or placed beyond discovery :

     DESTRUCTION , RUIN . . . .

*Id.* at 1338 (emphasis in original).[8]

  Applying the plain and ordinary meaning of "loss" to the Exclusion results in the

conclusion the Exclusion is ambiguous as, in this context, "loss" is susceptible of more

than one meaning.  Specifically, "loss" means either "any destruction[9] of proprietary

information . . ." or "any act of losing possession/deprivation of proprietary information

. . . ."  Each of these definitions convey different meanings with respect to coverage.  As to

the first, a reasonable construction is that there is no coverage for proprietary information

for which the structure, organic existence or condition is ruined.  In layman's parlance, as

Exclusion 17 deals with computer technology, the Exclusion would not provide coverage if,

as a result of computer fraud, the proprietary information was destroyed by a virus or a

---

[8]WEBSTER'S also sets forth the following definitions for "loss":

**2:** a person or thing or an amount that is lost: . . .
**3** **a:** failure to gain, win, obtain, or utilize
  **b:** an amount by which the cost of something exceeds its selling price
       * * *
**4:** decrease in amount, magnitude, or degree . . . .
**6:** the amount of an insured's financial detriment due to the occurrence of a stipulated event
  . . . .

(emphasis in original).

  However, applying these definitions to "loss" in the Exclusion does not result in a reasonable
construction.  As such, the Court will not consider these definitions.

  The Court notes that Defendant argues that the plain and ordinary meaning of "any loss" means
"every" "deprivation" to Plaintiffs "financial detriment", "of whatever kind".  However, as discussed in
greater detail later, in so arguing, Defendant imports two definitions for the term "loss", "deprivation" and
"financial detriment".  This is not a reasonable construction.  It is not appropriate to apply two distinct
definitions of one word into a phrase in order to interpret the word's meaning in the phrase.

[9]WEBSTER'S defines "destroy" as:

**1:** to ruin the structure, organic existence, or condition of . . . .
  **a:** demolition or complete ruin . . . .
  **b:** killing or annihilation . . . .
  **c:** a bringing to an end . . . .

*Id.* at 615.

server crashing. As to the second, a reasonable construction is that there is no coverage for proprietary information for which Plaintiffs are deprived. In other words, there is no coverage if the information is accessed and/or obtained by computer fraud and Plaintiffs no longer possess said information.

As stated by the Ohio Supreme Court,

It is not the responsibility of the insured to guess whether certain occurrences will or will not be covered based on nonspecific and generic words or phrases that could be construed in a variety of ways. Thus, in order to defeat coverage, "the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question."

*Andersen v. Highland House Co.*, 93 Ohio St. 3d 547, 549 (2001)(citations omitted).

Currently, the Exclusion is not capable of the construction Defendant favors as it requires "loss" to be defined by using two meanings, "deprivation" and "financial detriment." Specifically, Defendant seeks to have the Court import an additional term, loss, into the Exclusion as follows:[10]

Coverage does not apply to *every* [any] *deprivation* [loss] *to Plaintiffs financial detriment* [loss] of proprietary information . . . .

However, the Exclusion only contains "loss" one time. While courts are to "give meaning to every paragraph, clause, phrase, and word", *St. Marys Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 992 (6th Cir. 2003) (citation omitted), they should not add words to a contract under the guise of construing it. *Erie Ins. Group v. Tully*, Case No. CA-60631983, Ohio App. LEXIS 16064, *15 (5th Dist. June 6, 1983).

---

[10]Defendant's interpretation is italicized. The second "loss" is underlined.

Moreover, even if the Exclusion was capable of the construction Defendant seeks, it is not the only interpretation which can fairly be placed on the language of the Exclusion. As stated above, a reasonable construction of the Exclusion's language results in the conclusion it is subject to more than one interpretation. Accordingly, applying principles of contract interpretation to the Exclusion results in the determination the Exclusion is ambiguous and the ambiguities are construed against Defendant and in favor of coverage to Plaintiffs. *St. Marys,* 332 F.3d at 993.

### F.    Proprietary Information

Even if the Exclusion were interpreted as argued by Defendant, the conclusion that the Exclusion does not apply to the case at bar is unaltered.

First, the Court must examine whether the Customer Information constitutes proprietary information.[11] [12]  The relevant definition of "proprietary" is "**1** : one who has exclusive title to a thing : one who possesses the ownership of a thing in his own right . . . ." WEBSTER'S at 1819 . Moreover, the applicable definition of "exclusive" is "single, sole . . . ." WEBSTER'S at 793. As such, the plain and ordinary meaning of "proprietary information" in the Exclusion means information to which Plaintiffs own or hold single or sole right. In the case at bar, the Customer Information does not qualify as proprietary information as it is not information to which Plaintiffs had the sole right. To the contrary, there are many people/institutions which own or hold this information. For example, the

---

[11]For purposes of this analysis, the Court is not using proprietary information to refer to the phrase "proprietary information, Trade Secrets, Confidential Processing Methods or other confidential information of any kind."

[12]The Court notes the parties do not advance arguments with respect to "Trade Secrets" or "Confidential Processing Methods".

individual holder of the credit card or bank account, the financial institution which provides the credit card or bank account and the merchant to which this information is provided in the ordinary stream of commerce.

The next issue is whether the Customer Information falls within "other confidential information of any kind."  This phrase is a general catch-all phrase and, as such, the principle of *ejusdem generis* applies.  *Ejusdem generis* requires "that a general word in a . . . contract . . . takes its meaning from the specific words with which it appears . . . . " *Canton Police Benevolent Ass'n of Canton v. United States*, 844 F.2d 1231, 1236 (6th Cir. 1988); *United States v. Mabry*, 518 F.3d 442, 447 (6th Cir. 2008)("the same characteristic of discreteness shared by all the preceding items" apply to the term in question.).  Thus, "other confidential information of any kind" derives its meaning from the specific phrases in the Exclusion, "proprietary information", "Trade Secrets" and "Confidential Processing Methods".  As stated above, proprietary information pertains to information to which Plaintiffs hold the sole right.  Trade Secrets and Confidential Processing Methods are not defined in either the Crime Policy or Endorsement 17. However, these terms are capitalized which indicates they are proper nouns, referring to a specific item.

Guidance for the meaning of Trade Secret can be found in the common law definition of trade secret.  The Ohio Supreme Court adopted the definition of trade secret found in Comment (b) to the Restatement (Fourth) of Torts (1939), § 757 cmt. (b):

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process for manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. . . . A trade secret is a process or device for continuous use in the operation of the business.

*MacDermid Inc. v. Electrochemicals Inc.*, Nos. 96-3995, 96-4072, 1998 U.S. App. LEXIS 6663 (6th Cir. Mar. 31, 1998) (citations omitted). Accordingly, the capitalization of Trade Secret in the Exclusion means *Plaintiffs'* information which is used in *Plaintiffs'* business, and which gives *Plaintiff* an opportunity to obtain an advantage over competitors who do not know or use the information.

The following relevant definitions assist in determining the plain and ordinary meaning of Confidential Processing Method in the context of the Exclusion. Confidential means ". . . private , secret . . . ." WEBSTER'S at 476. Processing is defined as " . . . subject[ing] to a special . . . treatment . . . ." WEBSTER'S at 1808. Method means "a way, technique, or process of or for doing something . . . ." WEBSTER'S at 1423. Accordingly, Confidential Processing Method means *Plaintiff's* secret special treatment for doing something, which in the context of the Exclusion, relates to Plaintiff's business operation.

Accordingly, the specific terms in the Exclusion all pertain to secret information of Plaintiffs which involves the manner in which the business is operated. Thus, pursuant to the doctrine of *ejusdem generis* "other confidential information of any kind" means any other secret information of *Plaintiffs* which involves the manner in which the business is operated. This definition, contrary to Defendant's assertion, does not include the Customer Information. As stated earlier, the Customer Information is not *Plaintiffs'* information. Further, it is not information which involves the operation of Plaintiffs' business. Instead, it is the information which is necessary for Plaintiffs to obtain from its customers in order to be compensated for its goods. As such, "other confidential information of any kind" does not include the Customer Information and the Exclusion does not bar Plaintiffs' claim.

Finally, the Court notes that to permit the interpretation advanced by Defendant is contrary to the policy of Ohio courts to not "allow[ ] broad exclusions to bar indemnification for claims otherwise covered." *Owens,* 1998 U.S. LEXIS 26233 at *9-10 (citations omitted).

### F.  Section 2 Exclusions

In its Reply Memorandum in support of its Motion for Summary Judgment, Defendant, for the first time, raises the argument that the Section 2 Exclusions prevent coverage in this matter.  Upon consideration, the Court concludes Defendant's arguments are without merit.

With respect to Exclusion (k), "legal proceeding" is not defined.  Accordingly, it is unclear what constitutes a legal proceeding.  However, as argued by Plaintiffs, the Court need not interpret this term.  The Code of Federal Regulations, which governs FTC rules of practice, distinguishes between "inquiries" and "investigations" and "formal adjudicative proceedings".  *Compare* 16 C.F.R. §§ 2.1, 2.5 and 2.8(a) (pertaining to the initiation and procedures investigations and inquiries) with 16 C.F.R. §§ 3.1 and 3.2 (pertaining to the scope and nature of a formal adjudicative proceeding).  Therefore, the investigation by the FTC is not a legal proceeding.

Turning to Exclusion (m), the Court already concluded "direct" requires a proximate cause analysis.  Moreover, there is no suggestion that the damages Plaintiffs incurred are anything but compensatory.

Finally, Exclusion (n) does not apply.  Plaintiffs assert the only costs which they seek to recover which fall into this category are the fees and expenses associated with the instant litigation.  However, as argued by Plaintiffs, the recovery of these expenses is not

barred by Exclusion (n) as it flows from the bad faith conduct of Defendant as alleged in the Complaint. *See Zoppo v. Homestead Ins. Co.,* 71 Ohio St. 3d 552 (1994).

## III. CONCLUSION

For the reasons set forth above, the September 5, 2007 Motion of Plaintiffs for Partial Summary Judgment (Docs. 86 and 87) is hereby **GRANTED** and the September 6, 2007 Motion of Defendant for Summary Judgment (Docs. 89 and 90) is hereby **DENIED.**

**IT IS SO ORDERED.**

Michael H. Watson, Judge
United States District Court